NO. 16-6311

IN THE
UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

ANTHONY MANN,

*Petitioner- Appellant,*

v.

CECELIA REYNOLDS, Warden of Lee Correctional Institution,

*Respondent- Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

INFORMAL BRIEF OF PETITIONER-APPELLANT,
ANTHONY MANN

Elizabeth A. Franklin-Best
Blume Norris & Franklin-Best LLC
900 Elmwood Avenue, Ste. 200
Columbia, South Carolina 29201
FED ID #9969
(803) 765-1044
betsy@blumelaw.com

*Counsel for Petitioner-Appellant*

# TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................... i

TABLE OF AUTHORITIES...................................................... iii

JURISDICTIONAL STATEMENT ........................................ 1

STATEMENT OF ISSUES ..................................................... 1

STATEMENT OF THE CASE.................................................. 2

SUMMARY OF ARGUMENTS................................................ 15

STANDARD OF REVIEW ....................................................... 16

ARGUMENTS......................................................................... 17

    I.    Petitioner was Denied his Sixth Amendments Right to Effective
        Assistance of Counsel and his Right to a Public Trial Through
        Trial Counsel's Failure to Assert and Protect This Right When
        Various Secret Hearings Were Held in Petitioner's Trial............ 17

        a.    Right to a Public Trial............................................. 21

        b.    Ineffective Assistance of Trial Counsel................................ 26

    II.    Petitioner was Denied his Sixth Amendment Right to Effective
        Assistance of Counsel When Trial Counsel Failed to Object to the
        Introduction of a 12-gauge Shotgun and Seek Suppression of
        This Shotgun That was in no way Connected to Petitioner........ 27

    III.    Petitioner was Denied the Effective Assistance of Counsel in
        Violation of the Sixth Amendment by and Through Trial
        Counsel's Failure to Present the Testimony of Readily Available
        Experts in the Line of Pathology in Reference to the Time of

Death of B.B. ..................................................................................... 32

IV.  Petitioner was Denied the Effective Assistance of Counsel in
Violation of the Sixth Amendment and Rights to a Fair Trial in
Violation of the 14th Amendment When Counsel Failed to Object
to the Repeated References to Petitioner's Being in a Maximum
Security Prison at the Time of Trial. From the Very Outset of
Trial the Jury was Told That Petitioner was Serving Time at the
Lieber Correctional Institution, a Local Maximum Security
Prison ...................................................................................................

V.   Petitioner was Denied the Effective Assistance of Counsel in
Violation of the Sixth Amendment as a Result of the
Overwhelming Cumulative Prejudicial Effect of Each of the
Enumerated Errors Committed by Trial Counsel That Also
Effectively Denied Petitioner his Fundamental Rights of due
Process and a Fair and Public Trial ................................................ 45

CONCLUSION ....................................................................................... 48

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Alcala v. Woodford*, 334 F.3d 862 (9th Cir. 2003).................................................... 40

*Allen v. United States*, 164 U.S. 492 (1896) ........................................................... 14

*Arizona v. Fulminate*, 499 U.S. 279 (1991) ............................................................ 27

*Brady v. Maryland*, 373 U.S. 83 (1963) ................................................................. 18

*Brecht v. Abrahamson*, 507 U.S. 619 (1993).............................................. 27, 30, 41

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct, 2786, 125 L.Ed.2d ....................................................................................................................... 35

*Dreher v. Pinchak*, 61 Fed. Appx. 800 (3rd Cir. 2003) .......................................... 35

*Estelle v. Williams*, 425 U.S. 501 (1976).................................................................. 45

*Ewing v. Williams*, 596 F.2d 391 (9th Cir. 1997) ............................................. 46, 47

*Fisher v. Angelone*, 163 F.3d 835 (4th Cir. 1998)   .................................................. 46

*Foster v. Wolfenbarger*, 687 F.3d 702 (6th Cir. 2012)............................................. 36

*Gabaree v. Steele*, 792 F.3d 991 (8th Cir. 2015) ...................................................... 39

*Gannett Co. v. DePasquale*, 443 U.S. 368 (1979) .................................................... 25

*Griffin v. Warden*, 970 F.3d 1355 (4th Cir. 1992).................................................... 40

*Harris ex rel. Ramseyer*, 64 F.3d at 1438.................................................................. 47

*In re Oliver*, 333 U.S. 257 (1948) .............................................................................. 25

*Lyons v. McCotter*, 770 F.2d 529 (1985) .................................................................. 30

*Martin v. Grosshans*, 424 F.3d 588 (7th Cir. 2005) ................................................. 40

*Michelson v. United States*, 335 U.S. 469 (1948) ..................................................... 41

*Miller-El v. Cockrell*, 537 U.S. 322 (2003) ............................................................... 16

*Neder v. United States*, 527 U.S. 1 (1999) ............................................................... 26

*Presley v. Georgia*, 558 U.S. 209 (2013) ............................................................. 22, 25

*Press-Enterprise co. v. Superior Court of Cal., Riverside Cty.,* 464 U.S. 501 (1984) (*Press-Enterprise I*) ................................................................... 22, 24, 26

*Press-Enterprise co. v. Superior Court of Cal., Riverside,* 478 U.S. 1 (1986) ....... 23

*Rodriguez v. Hoke*, 928 F.2d 534 (2nd Cir. 1991) .................................................... 46

*Rose v. Clark*, 478 U.S. 570 (1986) ........................................................................... 27

*Strickland v. Washington*, 466 U.S. 668 (1984) ........................................... *passim*

*Sutton v. Bell*, 645 F.3d 752 (6th Cir. 2011) ............................................................. 46

*Thomas v. Clements*, 789 F.3d 760 (7th Cir. 2015) .................................................. 35

*United States ex rel. Bennett v. Rundle*, 419 F.2d 599 (3rd Cir. 1969) ................. 25

*United States v. Queen*, 132 F.3d 991 (1997) ........................................................... 40

*United States v. Ramirez-Castillo*, 748 F.3d 205 (4th Cir. 2014) .......................... 27

*United States v. Rivera*, 900 F.2d 1462 (10th Cir. 1990) ........................................ 46

*United States v. Washington*, 462 F.3d 1124 (9th Cir. 2006) .................................. 45

*Wainwright v. Lockhart*, 80 F.3d 1226 (8th Cir. 1996)............................................ 46

*Waller v. Georgia*, 467 U.S. 39 (1984) .........................................................*passim*

*Williams v. Washington*, 59 F.3d 673 (7th Cir. 1995) .......................................... 46

*Woolley v. Rednour*, 702 F.3d 411 (7th Cir. 2012) ............................................... 36

## OTHER

28 U.S.C. 2253 (c)............................................................................................. 16

U.S.C. §2254(d)(1),(2)............................................................................. 23, 27,30

## JURISDICTIONAL STATEMENT

This Court has jurisdiction over this habeas corpus proceeding pursuant to §§1291, 2253.  Petitioner filed a notice of appeal on March 2, 2016.

## STATEMENT OF ISSUES

Petitioner seeks a Certificate of Appealability ("COA") on the following issues:

1. Petitioner was denied his Sixth Amendment right to effective assistance of counsel and his right to a public trial through trial counsel's failure to assert and protect this right when various secret hearings were held in Mann's trial.

2. Petitioner was denied his Sixth Amendment right to effective assistance of counsel when trial counsel failed to object to the introduction of a 12-gauge shotgun and seek suppression of this shotgun that was in no way connected to petitioner.

3. Petitioner was denied the effective assistance of counsel in violation of the Sixth Amendment by and through trial counsel's failure to present the testimony of readily available experts in the line of pathology in reference to the time of death of B.B.

4. Petitioner was denied the effective assistance of counsel in violation of the Sixth Amendment and rights to a fair trial in violation of the 14th Amendment when counsel failed to object to the repeated references to petitioner's being in a maximum security prison at the time of trial.  From the very outset of trial the jury was told that petitioner was serving time at the Lieber Correctional Institution, a local maximum security prison.

1

5. Petitioner was denied the effective assistance of counsel in violation of the Sixth Amendment as a result of the overwhelming cumulative prejudicial effect of each of the enumerated errors committed by trial counsel that also effectively denied Petitioner his fundamental rights of due process and a fair and public trial.

## STATEMENT OF THE CASE

Petitioner was tried, in a single trial, for the killings of both D.T. and B.B. D.T. was killed on January 7, 2002 as established by multiple witnesses. B.B.'s body, however, was found on January 13, 2002 in a location far from where D.T. was fatally shot. The State's theory of the case was that petitioner killed B.B. because she witnessed petitioner shooting and killing D.T. The State stipulated that there was no forensic evidence connecting petitioner to B.B.'s death. DE No. 27-3, p. 48.

D.T. was the "owner" of a business called "Sillouettes," an organization that functioned as an escort service. B.B. was one of D.T.'s hookers. Young, homeless, and an exotic dancer living far from her New York family, she was living with D.T. when D.T. was killed. DE No. 27-1, p. 177. Earlier that night, B.B. called petitioner to ask him to help her escape from D.T. She was tired of being prostituted. According to state witnesses, B.B. informed petitioner that there were drugs and money in a

2

safe in the house.   The State's theory was that the drugs and money constituted the motive for the theft.   However, when police searched the house, they found $500 remaining in the safe.

Petitioner and state witnesses, Michael Crumb and Eric Zack, stopped by Peter Davies house to retrieve a gun.  They then went to D.T.'s house.   After a confrontation, D.T. was shot.   At the time he was shot, Crumb and Zack were sitting outside in the car.  Petitioner and B.B. were in the house.  They exited the house and drove away.

The State called multiple witnesses to testify to these events.  Donna Kann was a Charleston County EMS who lived across the street from D.T. She heard the gunshot.  It was dark and there were no lights in the area. At the time of her initial statement to the police, she described the shooter as wearing a knit cap.   In fact, she referenced the knit cap twice in her statement.   Docket No. 27-1, p. 210-211.   She testified that the person she saw "could have been" a woman.  DE No. 212-213.  She also testified that due to the person's "mannerisms" she thought it was a white person.  DE No. 27-1, 217.

Buddy Bedsaul was a law enforcement officer. He testified that Kann's initial description was of a white male, approximately 5'10", 180 pounds, and between the ages of 28-31. DE No. 27-1, 221.

The State then called the first of its highly problematic witnesses to the stand, Michael Crumb. At the time of his testimony, he had already pleaded guilty to voluntary manslaughter and armed robbery but was awaiting sentencing. DE No. 27-1, p. 268. He admitted that he initially lied to police. DE No.27-1, p. 311. He also stole a car and fled to Florida as the police were investigating the case. DE No., 27-1, pp. 314, 317. His mother was arrested for trying to cover up for him. DE No. 27-1, p. 319. Crumb testified that the last time he saw B.B. she was wearing jeans, a sweatshirt, and a bandana. DE No. 27-1, p. 324. Crumb admitted that he told Maria Jacques that he would "tell the police whatever [he] had to try and get out of this." DE No. 27-1, p. 329.

Crumb signed a proffer agreement with the State with the assistance of his attorney. Before he signed the proffer, though, he watched a video of another co-defendant, Eric Zack, give his statement to the police. DE No. 27-1,p. 373. As part of his sweetheart deal, he was allowed to plead guilty to lesser offenses, and he was also allowed to plead before a "lenient

4

judge." DE No. 27-1, p. 345. He was also allowed to see his son. DE No. 27-1, p. 349. At the time he gave his statement, he did not disclose his efforts to break into a safe that contained money and drugs in D.T.'s house. DE No. 27-1, p. 363. Once he signed his proffer agreement, Crumb, for the first time, told law enforcement that petitioner wore gloves that night. He told them that B.B. was looking for a bandana; that petitioner tried to open the safe; and that petitioner said he was going to "get rid" of B.B. DE No. 27-1, p. 369. Crumb admitted that he tried to minimize his involvement with these crimes when he spoke to law enforcement. DE No. 27-1, p. 370.

Eric Zack was another of the State's key witnesses with substantial problems telling the truth. He met with members of the Solicitors Office **four times** before trial, including the occasion when he made his videotape. DE No. 27-1, pp. 422-23. He initially lied about who went over to D.T.'s house that day. As he admitted, he was trying to protect Michael Crumb. DE No. 27-1, p. 391. He testified that when petitioner spoke of getting "rid" of B.B., he understood that to mean that he was going to hide her so she could go back to New York. According to him, petitioner had spoken that day about her going back to New York. DE No. 27-1, pp. 411-412; 432-

5

433.  Zack also testified that B.B. said that D.T. "got what he deserved."  DE No. 27-1, p. 435.

Zack testified that he believed initially that law enforcement was interested in Peter Davies' participation in this case.  At the time, Davies was also a suspect in a homicide investigation in Berkeley County. According to Zack, law enforcement informed him of petitioner's version of events, and wanted his story to "match" petitioner's.  DE No. 27-1, pp. 435-436.  He "just said what they wanted [him] to say to let [him] go home."  DE No. 27-1, p. 437. As he was being interviewed by law enforcement, he was crying and upset.  DE No. 27-1, p. 438. Zack admitted his version of events changed, and that he was trying to help himself out. DE No. 27-1, pp. 440-41.  Upon information and belief, both Crumb and Zack received 10 year sentences for their participation in these events, and both have been released from the South Carolina Department of Corrections.

Terrence Hudson testified for the State. He was good friends with Peter Davies.  DE No. 27-1, pp. 471-72.  On January 7, 2002, Peter Davies called him asking for a favor.  DE No. 27-1, p.473.  When Hudson arrived at an apartment in West Ashley, Davies told him that he, petitioner, and B.B.

6

needed a ride. DE No. 27-1, p. 475. They loaded two trash bags into the trunk of his car. Hudson testified that he thought he saw a gun in petitioner's pocket. DE No. 27-1, p. 476. Hudson was asked to take the three of them to a car at Player's Place off Ashley Phosphate Road, in Charleston, SC. DE No. 27-1, p. 477. He took them there and then left. DE No. 27-1, p. 478. On his way home, Hudson testified he saw that same car at a friend's house, so he stopped in. He testified he was there for about 5 minutes and saw that Peter Davies was in the shower. B.B. and petitioner were also there. DE No. 27-1, p. 478. Hudson testified that he and Peter Davies are no longer friends because Davies stole from him. DE No. 27-1, p. 489.

Michael Ringley of the Charleston County Sheriff's Office also testified for the State. He stated that D.T.'s body was found on the porch area of the house. DE No. 27-2, p. 16. Inside the safe in the house, there was a box containing $500. DE No. 27-2, p. 34. He did not retrieve any defendants' prints inside the house. DE No. 27-2, p. 52.

Nichole O'Connell testified. Petitioner and B.B. came to her house the night of January 7, 2002. She recalled that Petitioner asked B.B. if she had any regrets and that she got quiet. DE No. 27-2, p. 57. She said 'no'

she did not.  DE No. 27-2, p. 85. Peter Davies took a shower at her house,
which was unusual.  DE No. 27-2, pp. 55-56; 66.  B.B. was wearing blue
pants, a hoodie, and a bandana.  DE No. 27-2, p. 58.  She testified that she
thought B.B. was acting "odd" when she was at her house.  DE No. 27-2, p.
67.  O'Connell testified that she met with investigators from the Solicitor's
office **five times**.  She met with the solicitors on that many occasions, too.
DE No. 27-2, pp. 77-78.

Tiffany Mercado, or "Star," testified that B.B. was a good friend of
hers.  DE No. 27-2, p. 89.  B.B. did not have anywhere to live until she
moved in with D.T. DE No. 27-2, p. 90.  Earlier on January 7, 2002, she
spoke to B.B. who told her she needed to get out of D.T.'s house.  DE No.
27-2, p. 92.  Star did not have a car, so she could not come and pick her up.
DE No. 27-2, p. 93.  B.B. wanted to get out of D.T.'s house because D.T. and
his roommate wanted her to have sex with them and she did not want to.
DE No. 27-2, pp. 100-101.

The key evidence against petitioner was the testimony of Kristy
Bunch, his then-girlfriend who was clearly still angry with him over the
breakup.  According to her, petitioner wrote her a letter and asked her to
say that Peter Davies told her (Bunch) that "Brownie was still missing and

8

they won't find the little bitch." DE No. 27-2, p. 201. Bunch also testified to a letter sent by petitioner that asked her to testify that he was with her from Monday night, January 2, 2002 to Thursday night, January 10, 2002. DE No. 27-2, p. 202. In fact, Bunch had given a statement to law enforcement that stated she was with petitioner from 10:00pm on January 7th until the date they were arrested. She claimed that was a mistake, and that she confused her dates. DE No. 27-2, pp. 208-09. She uses drugs on a daily basis. DE No. 27-2, p. 217. If she did not cooperate with law enforcement, they threatened to take her children from her. DE No. 27-2, p. 222. She was questioned by "three or four or five different officers." DE No. 27-2, p. 222. She spent approximately 6 hours talking to law enforcement on the night she was arrested. Bunch testified that petitioner "confessed" to her during an argument they had over the telephone. Petitioner was incarcerated at Lieber Correctional, and despite law enforcement's attempts to recover a recording of this "confession," they never found one. DE No. 27-2, p. 204; 27-3, p. 80-85.

The State also called Shannon Keyes. DE No. 27-2, p. 359. She testified that she had a conversation with him, and that he said that he and Brownie had to "do something" but that it "didn't turn out the way it was

supposed to" and that "he had to do what he had to do and he had to lay low for awhile." DE No. 27-2, p. 362. She was interviewed by two officers, who handcuffed her towards the end of her interrogation. She testified it seemed like 8 hours. DE No. 27-2, p. 371. They showed her pictures of B.B.'s dead body. She had just turned 16 years old. It gave her nightmares. DE No. 27-2, p. 373.

Dustin Ryan James testified. DE No. 27-2, p. 379. He recalled seeing petitioner at the Old Dorchester Club on Friday, January 11th. DE No. 27-2, p. 379. He testified that he asked petitioner if he had seen B.B. and that petitioner motioned with his hands across his throat, pointed to his chest, and held a finger up to his mouth. DE No. 27-2, p. 380. James did not ask him any questions. At some point, he said petitioner told him that he "dealt with her and put her in the woods." DE No. 27-2, p. 381. Shortly after this encounter with petitioner in the bathroom, James testified there was a fight at ODC and that petitioner said, "I'm wanted for two murders now, I will kill you too." DE No. 27-2, p. 382. Dustin had just been released from federal prison. DE No. 27-2, p. 401. He also had convictions for assault with intent to kill, larceny, receiving stolen goods, contempt, and giving false information to the police. DE No. 27-2, pp. 402-03. When he was

giving his statement to law enforcement, he had been picked up on a burglary warrant. Even though Burglary 1st degree carries a possible sentence of 15 years to life, he was allowed to plead to a reduced charge and received 18 months. He testified he "paid a lot of money for a lawyer." DE No. 27-2, p. 404-05.

Maria Ann Jacques testified. DE No. 27-2, p. 409. She was at the Old Dorchester Club on January 11th and testified that petitioner said "he had a murder charge and he was not scared to get another one." DE No. 27-2, p. 413. The first time she spoke to law enforcement, and when she gave her 7 page statement, she did not say anything about this comment petitioner allegedly made. DE No. 27-2, p. 417.

During the defense's case, petitioner called Mark Akmen, the person with whom petitioner was fighting. DE No. 73-p. 277. Akmen testified that petitioner never said "he's got two murder charges and isn't afraid to get another" or "I'm wanted for two murders, I'll kill you too." DE No. 27-3, p. 283. The defense also called Chuck Jones, who was also there when the fight occurred. DE No. 27-3, p. 293. He never heard anyone speak of "murders" either. He broke up the fight between petitioner and Akmen. DE No. 27-3, p. 298.

11

The State called Krystal Lackey. DE No. 27-3, p. 56. She testified she saw petitioner "once" at a gas station, and then once when he came to her house. DE No. 27-3, p. 57. He was there to pick up a friend, Travis. Then, just out of the blue, petitioner apparently told her he killed two people! DE No. 27-3, p. 58. Although there were, according to Lackey, a number of other people there, the State did not call anyone else to testify they overheard this. DE No. 27-3, p. 59. Lackey was arrested in connection with a burglary, along with the other people she says were at her house that night. DE No. 27-3, p. 64. She was allowed to go through Pre-trial Intervention. DE No. 27-3, p. 65. The following exchange then took place:

Q:     Did you go through PTI?

A:     I'm going through it now.

Q:     You are?

A:     Uh-huh.

Q:     And the solicitor had to agree for you to go through PTI?

A:     No.

Q:     Nobody had to agree for you to go through it?

A:     No.

DE No. 27-3, p. 65.

The significance of this exchange is that it has long been the case in South Carolina that PTI is run through the Solicitors' Offices, and it has always been the case that the solicitor has to agree to a defendant's participation in the program. No one corrected Lackey's obviously false testimony on this point.

The State offered the testimony of "Mervin Menier," a serial state's witness with extraordinary credibility problems. Menier testified to the perfunctory "jail house confession." On cross-examination, Menier admitted he has used a number of aliases, including Damon Stone, Robert Quincy Rodriguez, Gary O'Neil Pamphile, Mark Taylor and/or Stone. DE No. 27-3, p. 111. He admitted he "basically" used names so he could commit crimes and it would be difficult to catch him. *Id.* They had to have a two day federal court hearing to determine his identity in another case. DE No. 27-3, p. 114.

In addition to Akmen and Jones-- the two witnesses present at the fight at the Old Dorchester Club but who did **not** hear petitioner yell anything about any murders-- the defense called William Woodson. Woodson knew Michael Crumb from prison. Woodson testified that

Crumb told him that B.B. shot D.T, and that Michael Crumb said that he would do anything to get out of these charges.    DE No. 27-3, p. 306 – 362.

Petitioner did not testify at trial.    The jury began deliberations at 3:10pm.    After receiving an *Allen*[1] charge, they rendered their verdict at 11:16pm.

After his conviction, petitioner filed a direct appeal challenging his convictions for two counts of murder and armed robbery and his sentence of life in prison without parole.    His convictions and sentence were affirmed by the South Carolina Court of Appeals on January 11, 2007 without opinion.    Petitioner then filed an application for post-conviction relief.    On January 26, 2011 the circuit court denied relief.    The South Carolina Supreme Court then denied petitioner's petition for writ of certiorari on December 4, 2014 without opinion.    Petitioner then timely filed his petition for writ of habeas corpus on January 13, 2015.

---

[1]      *Allen v. United States*, 164 U.S. 492 (1896).

14

## SUMMARY OF ARGUMENT

Petitioner was denied his right to the effective assistance of counsel throughout his trial for two counts of murder and armed robbery. He was also denied his right to due process when the trial court judge held four hearings outside the presence of the public.

Petitioner's counsel failed to protect petitioner's right to a public trial when she allowed, without objection, the trial court judge to close the courtroom on four occasions. The trial court judge further violated petitioner's rights when he failed to undertake the steps required by *Waller v. Georgia*, 467 U.S. 39 (1984) prior to closing the courtroom.

Petitioner's counsel also failed to protect her client's rights by not objecting to the admission of a shotgun that had no connection to either petitioner or the crimes.

Petitioner's counsel also failed to secure the testimony of a pathologist who would have opined that the State's pathologist used an out-of-favor and dated manner of establishing a victim's time of death, and when time of death was a critical issue at the trial.

Petitioner's counsel also failed to object to repeated references to petitioner's being housed at a maximum security prison during the

15

pendency of his pre-trial detention when the admission of that evidence tended to highlight petitioner's alleged violent character.

Individually, and collectively, these errors served to undermine petitioner's right to a fair trial.

## STANDARD OF REVIEW

"[A] prisoner seeking a COA need only demonstrate 'a substantial showing of the denial of a constitutional right." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003) (quoting 28 U.S.C. 2253(c)). "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude that the issues presented are adequate to deserve encouragement to proceed further." *Miller-El*, 537 U.S. at 327. The United States Supreme Court has explained:

> The COA determination under §2253(c) requires an overview of the claims in the habeas petition and a general assessment of their merits . . . This threshold inquiry does not require full consideration of the factual or legal bases adduced in support of the claims. In fact, the statute forbids it.

*Id*. at 336.

## ARGUMENTS

**I.      Petitioner was denied his Sixth Amendment right to effective assistance of counsel and his right to a public trial through trial counsel's failure to assert and protect this right when various secret hearings were held in Petitioner's trial.**

There were four hearings that occurred during this trial outside the presence of the public and, at times, outside the presence of petitioner or his attorneys.

First, the Public Defender's Office subpoenaed a Berkeley County investigative file relating to their investigation of Peter Davies in an on-going homicide investigation. The Berkeley County Sheriff's Office moved to quash the subpoena. DE No. 27-1, p. 137. The trial court judge then called the parties into chambers to hear "how it could implicate [petitioner's] case."

The court said:

> [F]irst I want to hear what her legal defense, hear any arguments she has that could implicate the defense of the defendant, then I will make a decision on whether it should be in a closed proceeding or not, and then depending on that decision, I will hear the Berkeley County office and their motion back in here.
>
> All right. I'm only going in chambers to only hear how it could implicate your case, then we'll come back in here and argue the law.

17

Madam Court Reporter, you need to set up in the conference room, please.

DE No. 27-1, pp. 143-44.

The issue was not further argued on the record.

Then, a second hearing also related to the subpoena issue was held outside the presence of the public, and this time trial counsel was not allowed to be present either. Trial counsel argued:

> MS. SHEALY: And, your Honor, again my position would be that I would be prejudiced and entitled to be present for the hearing.
>
> THE COURT: Well, I've already heard your reasons. Anything else is going to be arguments of the law. You were able to present to me *ex parte* how it affects the case. If we have to do that again, we'll do that . . . But I have to hear everybody else on this issue, too. If it turns, for example, as to whether this is a *Brady*[2] issue, they have a right to be heard on that. You seem to think that you get to argue the whole matter without anyone getting to say anything. I disagree with that.

DE No. 27-1, p. 253.

Trial counsel argued that the matter could possibly pertain to *Brady* material. DE No. 27-1, p. 256. The public, trial counsel, and petitioner were all absent from this hearing.

---

[2]      *Brady v. Maryland*, 373 U.S. 83 (1963).

18

After the hearing, the court indicated that the hearing was "solely for the purpose of hearing the County's request to quash the subpoena, which indicated that I didn't think the State had a role in that particular aspect of it.

> In order to preserve the State's request that they have some concern about disclosure of information in another case insofar as law enforcement investigations, no information has been turned over. The Court decided that it would look at the information itself and decide whether or not it could be used for any purpose other than the one articulated in court as a legal basis yesterday, that being bias. So if it does turn into something that I think has to be disclosed, then I will get back with each side and let you know that."

DE No. 27-1, p. 260.

The public was excluded from both of these hearings relating to the subpoena issue without any findings that its exclusion was necessary, or whether there were other, less restrictive ways to conduct the proceeding.

Then, later in trial, defense counsel informed the court that there were concerns that the Solicitor's office or their representatives were influencing the testimony of witnesses in a manner adverse to petitioner's defense. DE No. 27-3, p. 429. A third hearing related to this issue was taken in a conference room. DE No. 27-3, p. 430. Then, a fourth hearing

was then also held.  It is unclear what this hearing pertained to.[3]  See Volume 8, gap between Tr. pp. 1479-1523.

Transcripts of these hearings do not exist because they were not requested by appellate counsel prior to the time court reporters are allowed to destroy their tapes.  Four hearings, conducted outside the presence of the public (and at least one hearing conducted outside the presence of petitioner and his attorney as well), were held without objection from trial counsel, and without the trial court judge making a finding that the closures were necessary, or if there were less restrictive means by which to conduct the proceedings.  Petitioner has couched this claim both in terms of the denial of his right to effective assistance of counsel, and as a right to a public trial.

Petitioner raised this claim in the state court proceeding, and the PCR judge held:

> This Court finds that Applicant was not denied the right to a public trial.  The in-camera hearings were on the record in the sealed transcripts.

---

[3]    The district court's order denying habeas relief claims this fourth hearing was "just another hearing on the allegation of witness intimidation", DE 57 p. 9, but there is no indication in the record that the author can see that confirms that statement.

20

DE No. 27-4, p. 426.

In the order denying habeas relief, the district court found that *Waller* did not apply because "Petitioner asked for two hearings to be closed, and because two other hearings were just continuations of those two hearings, *Waller* does not *apply to those four hearings*."  DE 57, p. 11 (emphasis in original).    For the reasons below, Petitioner maintains that the district court erred in denying habeas relief, because the state court adjudication was clearly unreasonable.

(a) <u>Right to a Public Trial</u>

The trial court judge's actions violated petitioner's rights to a public trial by holding four hearings outside the presence of the public, petitioner, and even petitioner's attorney (during one hearing), without articulating reasons for the closure, or considering other, less restrictive alternatives. The law on this issue is clear—there is a presumption that a trial shall be open to all members of the public.  The right to an open trial may give way in certain instances to other rights or interests such as a defendant's right to a fair trial, or the government's interest in inhibiting disclosure of sensitive information.  The United States Supreme Court, in *Waller v. Georgia*, 467

U.S. 39 (1984) set out the standards courts must apply before excluding the public from any stage of a criminal trial:

> [T]he party seeking to close the hearing must advance an overriding interest that is likely to be prejudiced, the closure must be no broader than necessary to protect that interest, the trial court must consider reasonable alternatives to closing the proceeding, and it must make findings adequate to support the closure.

The trial judge's obligations on this point are beyond dispute: "The conclusion that trial courts are required to consider alternatives to closure even when they are not offered by the parties is clear not only from this Court's precedents but also from the premise that "[t]he process of juror selection is itself a matter of importance, not simply to the adversaries but to the criminal justice system." *Presley v. Georgia*, 558 U.S. 209 (2013) (quoting *Press-Enterprise Co. v. Superior Court of Cal., Riverside Cty.*, 464 U.S. 501, 505 (1984) (*Press-Enterprise I*)).

The trial court judge simply failed to undertake what the United States Supreme Court demands. The trial court judge had to identify the specific interests implicated, the threat to those interests, which must "be articulated along with findings specific enough that a reviewing court can determine whether the closure order was properly entered." *Presley* at 215-

216 (quoting *Press-Enterprise I* at 510).    And see *Press-Enterprise Co. v. Superior Court of Cal., County of Riverside,* 478 U.S. 1, 15 (1986) ("The First Amendment right to access cannot be overcome by the conclusory assertion that publicity might deprive the defendant of [the right to a fair trial"]).

The trial court judge's decision to remove these four hearings from the public courtroom (and even removing the defendant and trial counsel), without articulating an overriding interest that was likely to be violated, or considering reasonable alternatives to closure, violated petitioner's right to a public trial under the Sixth Amendment.  The state court adjudication of petitioner's claim—that petitioner was not denied his right to a public trial because "the in-camera hearings were on the record and in the sealed transcripts" resulted in a decision that was contrary to, or involved an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States, and was also based on an unreasonable determination of the facts in light of evidence presented in the State court proceeding.    §2254(d)(1), (2).    The state court decision simply does not comport with the clearly established federal law, and does not even mention *Waller* in its decision.

*Waller* laid out the framework for determining whether a closure violates a defendant's Sixth Amendment public trial right:

> The presumption of openness may be overcome <u>only</u> by an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest. The interest is to be articulated along with findings specific enough that a reviewing court can determine whether the closure order was properly entered.

*Waller*, 467 U.S. at 45 (quoting *Press-Enterprise Co. v. Superior Court*, 464 U.S. 501, 510 (1984) (emphasis added). The district court's decision (which adopted the magistrate judge's R&R) seeks to expand *Waller* in two important respects. First, it is importing the requirement that a defendant either expressly object to a closure or else he waives the right to raise a *Waller* claim. And also, that waiving the right to a public jury trial with respect to two hearings thereby waives <u>all</u> challenges to courtroom closure. Neither of these is required by *Waller* and, in fact, the reasoning of *Waller* militates against this interpretation.

The Court in *Waller* noted that "[t]he central aim of a criminal proceeding must be to try the accused fairly, and "[o]ur cases have uniformly recognized the public-trial guarantee as one created for the

24

benefit of the defendant." *Waller* at 46 (quoting *Gannett Co. v. DePasquale*,

443 U.S. 368, 380 (1979)).

> The requirement of a public trial is for the benefit of the accused; that the public may see he is fairly dealt with and not unjustly condemned, and that the presence of interested spectators may keep his triers keenly alive to the sense of their responsibility and to the importance of their functions . . .."″″ *Ibid.* (quoting *In re Oliver*, 333 U.S. 257 n. 25 (1948), in turn quoting T Cooley, Constitutional Limitations 647 (8th ed. 1927)).

> In addition to ensuring that judge and prosecutor carry out their duties responsibly, a public trial encourages witnesses to come forward and discourages perjury. See *In re Oliver, supra*, at 270; *United States ex rel. Bennett v. Rundle*, 419 F.2d 599, 606 (3rd Cir. 1969).

*Waller* at 46.

The district court opinion held that a defendant had to specifically

object in order to raise a *Waller* claim, DE. 57, p. 10, but the United States

Supreme Court explicitly rejected that reasoning in its recent case, *Presley v.*

*Georgia*, 558 U.S. 209 (2013). In that case, the Court rejected the Supreme

Court of Georgia's argument that trial courts did not need to consider

alternatives to closure absent an opposing party's proffer of alternatives.

In quoting *Press-Enterprise*, the Court reiterated:

> Even with findings adequate to support closure, the trial court's orders denying access to *voir dire* testimony failed to consider whether alternatives were available to protect the interests of

the prospective jurors that the trial court's orders sought to guard. Absent consideration of alternatives to closure, the trial court could not constitutionally close the *voir dire*.

464 U.S., at 511.

And, "The public has a right to be present whether or not any party has asserted the right." *Id.* at 724-25.

> In *Press-Enterprise I*, for instance, neither the defendant nor the prosecution requested an open courtroom during juror *voir dire* proceedings; in fact, both specifically argued in favor of keeping the transcript of the proceedings confidential. The Court, nonetheless, found it was error to close the courtroom.

*Presley*, 558 U.S., at 214.

(b)    Ineffective Assistance of Trial Counsel

Trial counsel failed to challenge the court room closures on her client's behalf, or insist that the trial court judge make findings as required by law. Trial counsel's performance was ineffective. *Strickland v. Washington*, 466 U.S. 668 (1984). The state court judge did not address this claim in the order of dismissal. Neither did the district court judge in the order denying relief. DE 57.

The error in this case is structural and "affect[s] the framework within which the trial proceeds, rather than simply an error in the trial process itself." *Neder v. United States*, 527 U.S. 1, 8 (1999) (quoting *Arizona*

*v. Fulminante*, 499 U.S. 279, 310 (1991)). "Such errors 'infect the entire trial process,'" *id.* (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 630 (1993), and "necessarily render a trial fundamentally unfair," *id.* (quoting *Rose v. Clark*, 478 U.S. 570, 577 (1986). And see *United States v. Ramirez-Castillo*, 748 F.3d 205, n. 8 (4th Cir. 2014) (recognizing that the Supreme Court has found structural error in limited cases, including *Waller v. Georgia*). The district court erred when it did not find that the state court adjudication on this issue resulted in a decision that was contrary to, or involved an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States, and was also based on an unreasonable determination of the facts in light of evidence presented in the State court proceeding. §2254(d)(1), (2).

## II. Petitioner was denied his Sixth Amendment right to effective assistance of counsel when trial counsel failed to object to the introduction of a 12-gauge shotgun and seek suppression of this shotgun that was in no way connected to petitioner.

Trial counsel did not object to the State's introduction of a completely irrelevant shotgun. The State failed to provide any evidence at all that the gun it admitted had any connection to either shooting, or even to petitioner. It was found behind a McDonald's restaurant in Dorchester

County.  Indeed, the Attorney General's Office concedes that the bullets found in connection with both D.T. and B.B.'s deaths (and which were from different weapons) *did not come from that gun*.  DE 27, p.27.  Its introduction therefore was irrelevant, and also extraordinarily prejudicial. The Attorney General's Office argues that its introduction was non-prejudicial because it was not related to the crime.

The gun was introduced into evidence at DE No. 27-3, p. 168 without objection from trial counsel.  The State introduced the gun through Sergeant Walker, the lead investigator in this case.  DE No. 27-3, p. 132. Walker testified to numerous aspects of this case.  He interviewed a number of witnesses.  He visited the scenes.  He collected "pertinent evidence."  DE No. 27-3, p. 136.  He explained how petitioner became a suspect.  He conducted the suspect evidence collection kit.  He executed numerous warrants.  He met with Eric Zack on three occasions.  He sent "guns" and "bullet fragments" to be tested.  DE No. 27-3, p. 155.  He analyzed petitioner's driving record.  Then, the solicitor asked this:

"[T]here was a shotgun that was recovered in regards to this case; is that correct?"  DE No. 27-3, p. 157.

28

The solicitor then moved the *gun into evidence along with a map showing where the gun was found in relation to where B.B.'s body was found*. DE No. 27-3, p. 168. The clear implication of the introduction of this evidence was to suggest to the jury that the gun had some connection with B.B.'s murder. Its introduction was highly prejudicial and improper. The prejudicial effect of this evidence was magnified by its introduction through the lead investigator in the case. The jury would, rightfully, regard Sgt. Walker's testimony as highly probative given his intimate connection with the investigation.

The Solicitor then compounded the prejudicial effect of the introduction of this evidence when she argued during closing argument that the irrelevant shotgun may, in fact, be the murder weapon:

> She tells you a silver handgun he has. What does he tell you? He stole a chrome 357 from Dante.
>
> You also have in the stipulations that Dante and Beverly were not killed with the same gun. You want to bear that in mind.
>
> They tell you when they got back to Peter's, Amp and Peter start breaking down the 9-millimeter. So that leaves us the Derringer which they take and give to Michael's cousin. **That leaves this gun which is found by some McDonald's on Ashley Phosphate**, and that leaves the chrome 357 which Nicky sees him wiping down.

Volume 8, pp. 1591-92 (emphasis added).

The South Carolina state court addressed this issue and stated:

This Court finds that Applicant was not prejudiced by counsel's failure to object to the admission of the shotgun. In his written statement, Applicant admitted that Ms. B had taken a shotgun from Mr. Tobias's house. Because there was no link between the gun and the two murders, the admission of the gun did not prejudice Applicant.

DE 27-4, p. 424.

This decision is contrary to, or involves an unreasonable application of clearly established Federal law as determined by the Supreme Court of the United States, and is also an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. §2254(d)(1),(2). Its admission had a substantial and injurious effect on the jury's verdict. *Brecht v. Abrahamson*, 507 U.S. 619.

The introduction of the shotgun was clearly error as it had no connection to these killings. As the Fifth Circuit held in *Lyons v. McCotter*, 770 F.2d 529 (1985), "To pass over the admission of prejudicial and **arguably inadmissible** evidence may be strategic; to pass over the admission of prejudicial and **clearly inadmissible** evidence . . . has no strategic value" (emphasis added). There is no question but that, had

30

counsel objected to the admission of the shotgun, it would not have been entered into evidence. Instead, by not objecting, the jury was left with the clear impression that that gun belonged to petitioner, and that it had a connection with B.B.'s death. The introduction of this irrelevant non-evidence had a substantial and injurious impact on the jury because the Solicitor led the jury to believe it actually could have been the murder weapon and, more specifically, the weapon used to kill B.B. This is especially true given how little evidence there was that implicated petitioner in B.B.'s murder. Indeed, this irrelevant, non-evidence was the *only gun that was admitted into evidence at all*. There was no forensic evidence tying petitioner to her murder; no eyewitnesses. As detailed in the statement of facts, there was very little probative evidence tending to tie petitioner to B.B.'s death which magnifies the prejudicial impact of trial counsel's failure to properly object to its introduction. The state court decision is contrary to, and involves an unreasonable application of *Strickland v. Washington*, 466 U.S. 668 (1984). It is also an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. Petitioner was prejudiced by its improper admission into evidence.

**III. Petitioner was denied the effective assistance of counsel in violation of the Sixth Amendment by and through trial counsel's failure to present the testimony of readily available experts in the line of pathology in reference to the time of death of B.B.**

The South Carolina state court did not address this claim raised by petitioner in her order of dismissal. In response to the order of dismissal, petitioner filed a motion to amend the judgment to address this issue. DE No. 27-4, p. 433. The circuit court judge denied the motion without opinion. DE No. 27-4, p. 442.

As PCR counsel argued to the judge, petitioner was with his girlfriend from Tuesday the week of the murders until the time of his arrest. The State's theory was that B.B. was murdered on Monday. The time of death was absolutely critical to the State's theory and petitioner's defense.

At trial, Dr. Susan Erin Presnell testified as to the time of death of B.B.[4] According to her testimony, her first opinion on the time of death, based on the condition of the body, was that B.B. had only been dead for a few days when her body was found. This would have put the time of death squarely within the time period for which petitioner had an alibi.

---

[4]    Her testimony begins at DE No. 27-2, p. 420.

Dr. Presnell admitted in her testimony that she received pressure from law enforcement to give an opinion on the time of death more compatible with law enforcement's theory of the murder.

According to her trial testimony, Presnell used an alternative theory to determine a time of death for B.B. She used a measurement derived from the potassium levels in B.B.'s vitreous fluid. This vitreous fluid, located in the eyes, is measured with several different formulas. Presnell testified she was using one particular formula to offer an opinion regarding time of death that was more compatible with law enforcement's theory than other possible formulas.

Although trial counsel was able to make limited points with cross-examination, Presnell was still able to offer the opinion of time of death that was consistent with the State's theory that B.B. was killed on Monday.

At the PCR hearing, Dr. Janice Ross of Newberry Pathology Associates testified for petitioner. She is a forensic pathologist board certified in anatomic, clinical, and forensic pathology. She has been a pathologist for over thirty years and has testified numerous times regarding causes and manners of death. She has testified and performed

autopsies for various state agencies.  Dr. Ross was qualified to offer expert testimony in the field of forensic pathology.

Dr. Ross testified regarding the use of potassium levels in vitreous fluids to determine time of death.  She testified she was aware of the process, but that it was no longer taught and had fallen out of favor as a way to determine time of death.  By the time she was being trained, it was not being used as a way to determine time of death.  DE No. 27-4, p. 307. The leading resources in forensic pathology do not recognize vitreous measurements for purposes of determining postmortem time interval.  DE No. 27-4, p. 307.  Dr. Ross testified, in her expert opinion, vitreous fluid was not an acceptable way to determine time of death and should not be used to estimate time of death.  She further testified this was the commonly accepted opinion in her field and most pathologists would have testified to this at the time of petitioner's trial.  DE No. 27-4, p. 307.

This issue was particularly critical to the defense based on the State's theory. The State's own witness, Kristy Bunch, provided an alibi for petitioner almost the entire week in question.  If the time of time of death were estimated to fall within this time period, petitioner would have had an absolute defense to B.B.'s murder.

34

There is no strategic reason for failing to secure an expert to impeach a state witness on a critical issue in the case, especially when the area of expertise is largely regarded by others in the field as unreliable and dated. As Dr. Ross testified, this manner of determining time of death has fallen out of favor with medical experts. The fact that defense counsel spoke to some experts about time of death issues does not mean that counsel rendered effective assistance of counsel when they failed to challenge a highly unreliable, disfavored method of determining death, and especially when time of death was the central issue in the case.[5]  See *Thomas v.*

---

[5]      See *Dreher v. Pinchak*, 61 Fed. Appx. 800 (3rd Cir. 2003), regarding vitreous measurement to determine time of death: "The District Court was clearly concerned about the admission of Dr. Tucker's testimony, writing that "[e]ven under the liberal standards of the Federal Rules of Evidence, Dr. Tucker's testimony should not have made it past the 'gatekeeping role' of the trial judge." *Dreher v. Pinchak,* Slip Op. at 25 (quoting *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 597, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993)). The District Court was likewise alarmed that the trial court "permitted Dr. Tucker to present his findings, despite the fact that his method of applying the vitreous potassium test fails to satisfy" the traditional indicia of reliability. *Id.*  Finally, the District Court opined that "[w]ere it a question of first impression for this Court to decide, the admission of this testimony might well be considered a violation of petitioner's rights of due process." *Id.* Then, after recognizing that "it is well established that due process may be violated by the admission of certain categories of unreliable and prejudicial evidence," the District Court concluded that, "standing alone, the

*Clements*, 789 F.3d 760 (7th Cir. 2015) (Defense counsel's failure to consult with pathologist or other medical expert as to whether murder victim's strangulation death could have been result of accident amounted to deficient performance, and when defense counsel's failure to reach out to expert was not conscious decision, but that he just did not think to do so); *Foster v. Wolfenbarger*, 687 F.3d 702 (6th Cir. 2012) (Defense counsel's failure not to further investigate and present alibi defense was deficient, although counsel interviewed alibi witness over the phone for approximately 15 to 20 minutes and found witness's testimony to be vague, counsel failed to perform any additional investigation); *Woolley v. Rednour*, 702 F.3d 411 (7th Cir. 2012) (Defendant's trial counsel's failure to secure expert opinion to rebut testimony of State's crime scene investigator rendered trial counsel's performance objectively unreasonable; it was undisputed there was no strategic rationale underlying trial counsel's error, and there were significant holes in the crime scene investigator's conclusions that required expert illustration by defense in order for the jury to weigh the evidence fairly).

---

admission of Dr. Tucker's testimony did not violate petitioner's right to due process." *Dreher v. Pinchak,* Slip Op. at 26, 27.

The district court found Petitioner could only show prejudice if defense could find an expert witness who would exclude January 7th as the time of death. ("The defense needed an expert witness who would exclude a January 7 time of death" DE 57, p. 15).   The order fails to acknowledge the centrality of the time of death issue for B.B. since the only other evidence tending to show that petitioner could have committed the murder was the highly problematic testimony of Mervin Menier.  It also fails to appreciate that the State did not even have a murder weapon identified in that case and that the State moved in a completely irrelevant shotgun in order to shore up its case against Petitioner.  See Argument II.

Trial counsel's performance was objectively unreasonable, and fell well below professional norms.  *Strickland, supra.*  Had counsel contacted any pathologist and inquired as to the use of vitreous fluids for determining time of death, she would have realized that it was not a reliable method.   And at least one district court found it "alarming" that this method was admitted into evidence in another case.   Trial counsel's failure to do so, when time of death was the key issue in the death of B.B., rendered her performance ineffective.  The state court decision is contrary to, and involves an unreasonable application of *Strickland v. Washington,*

37

466 U.S. 668 (1984). It is also an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. This error had a substantial and injurious effect or influence in determining the jury's verdict.

**IV. Petitioner was denied the effective assistance of counsel in violation of the Sixth Amendment and rights to a fair trial in violation of the 14th Amendment when counsel failed to object to the repeated references to petitioner's being in a maximum security prison at the time of trial. From the very outset of trial the jury was told that petitioner was serving time at the Lieber Correctional Institution, a local maximum security prison.**

Trial counsel's performance fell well below professional norms when she allowed repeated references to be made at trial indicating that petitioner was housed in a maximum security prison facility as he awaited trial on these charges. In addressing this issue, the PCR court judge found:

> [T]rial counsel was not ineffective for failing to object to references to Applicant being housed at Lieber and for allowing prison guards to sit in close proximity to Applicant during trial. Counsel testified that Applicant was not in handcuffs or prison garb, and there were no references to Applicant being convicted of anything. In addition, counsel testified that she did not object to the potential juror's comment "I used to work for SCDC where he's at" because she did not want to draw attention to it. This Court finds that counsel properly noted her reasoning on the record.

DE No. 27-4, p. 424.

First of all, the PCR court's order does not accurately reflect what the

record shows.  The following is what happened at the PCR hearing:

> Q:     Okay.  So on Line 27 that juror says in front of all the
> jurors, I used to work for SCDC where he's at.  I've got two
> questions about that.  Number one, how would he know that, if
> you know?  And number two, why did you not object at that
> point and move for a mistrial for the fact the entire jury panel
> would have been tainted from the very beginning?
>
> A:     I don't know how to answer that, other than to say that
> maybe we made a decision that when the juror responds where
> he's at, that it wasn't overly clearly who that person was
> referencing, but I'm not sure about that.   And I could not
> answer how that person would know that that was where Mr.
> Mann was.
>
> Q:     Okay.  So I guess your other answer is, you're not sure
> why you didn't object?  You said, we could have made this, we
> could have, but you can't recall?
>
> A:     I don't recall.

DE No. 27-4, pp. 196-97.  And see DE No. 27-4, p. 211 ("I do not remember

it.  I don't know how I could be more clear than that?")

Contrary to the judge's order, the testimony reflects that trial counsel

did not give any reason why she did not object because she did not recall it.

See *Gabaree v. Steele*, 792 F.3d 991, 999 (8th Cir. 2015) ("We cannot impute to

counsel a trial strategy that the record reveals she did not follow"). See also

*Alcala v. Woodford*, 334 F.3d 862, 871 (9th Cir. 2003); *Griffin v. Warden*, 970 F.2d 1355, 1358-59 (4th Cir. 1992).

But also, the PCR judge's order fails to consider why trial counsel repeatedly failed to object to the references to petitioner's placement in a maximum security prison while in pre-trial detention. Indeed, counsel stated during voir dire that this was information that she did not want to bring to the attention of the jurors. DE 27-1, p. 114.

Failure to object to improper testimony because one does not want to "draw attention to it" is not a valid strategy because one can always make a motion for a mistrial outside the presence of the jury. See *Martin v. Grosshans*, 424 F.3d 588 (7th Cir. 2005) (trial counsel rendered ineffective assistance of counsel for, among other things, not objecting to improper argument because he did not want to draw attention to it).

Evidence that petitioner was housed in a maximum security prison facility while in pre-trial detention was clearly highly inflammable, and prejudicial character evidence.

As the Fourth Circuit noted in *United States v. Queen*, 132 F.3d 991 (1997):

> The principal danger that Rule 404(b) targets is addressed by the language of the rule itself—that defendants not be convicted simply for possessing bad character. See *Michelson v. United States*, 335 U.S. 469, 475-76 (1948) (explaining that propensity evidence is excluded because it might "overpersuade" a jury and cause them to "prejudge one with a bad general record"); Wigmore on Evidence §58.2, at 1215 (Tillers rev. 1983) (noting the concern courts have felt over "the overstrong tendency to believe the accused guilty of the charge merely because he is a likely person to do such acts"). This danger is compounded by the idea that juries might face defendants whom the government has brought forth merely because it has "rounded up the usual suspects" who have a history of prior bad acts.

*Id*. at 997.

The jurors surely would have known about Lieber, as it is a well-known, violent prison located in that part of the state.[6] Trial counsel's failure to keep this information from the jury throughout petitioner's trial fell well below professional norms and petitioner's jury was substantially and injuriously affected by that failure. *Strickland, supra*; *Brecht, supra*. This decision is contrary to, or involves an unreasonable application of clearly established Federal law and determined by the Supreme Court of the

---

[6]    See Walking with Murderers: An inside look at SC's Most Dangerous Prison. http://www.live5news.com/story/17037053/special-report-walking (*last visited* 10/26/15).

41

United States, and is also an unreasonable determination of the facts in

light of the evidence presented in the State court proceeding.  2254(d)(1)(2).

During her cross-examination of Kristy Bunch, trial counsel elicited

from her that petitioner was housed at Lieber:

> Q:    And then you told us that when he was out at Lieber, you
> all had a conversation and you all were arguing; is that correct?

DE No. 27-2, p. 211.

And again:

> Q:    And in doing so, you know that at Lieber, they record
> telephone conversations; is that correct?
>
> A:    Yes.

DE No. 27-2, p. 212.

And again:

> Q:    You got irritated with him because he was still seeing
> people like Maria Jacques while he was in prison; is that
> correct?  Or talking to her, talking to her?

DE No. 27-2, p. 225.

And again:

> Q:    So you were mad at him about lying about the women
> and he was irritated with you about sleeping with someone else
> while he was in jail and becoming a prostitute.  Or did you
> become a prostitute or just further it?  Had you already
> prostituted yourself before he went to prison?

DE No. 27-2, p. 226.

Then, trial counsel failed to object when the Solicitor called its investigator,

John Burnett and elicited testimony that petitioner was housed pre-trial at

Lieber:

> Q:    And as part of your investigation into this case, did you go to research telephone calls in the South Carolina Department of Corrections?
>
> A:    I did, at Lieber Correctional Institution.
>
> Q:    Tell the jury where Lieber is.
>
> A:    Lieber is west of Charleton in what is called Jedburg.

DE No. 27-3, p. 80.

Burnett then discussed how he traced calls "by inmate number."  DE

No. 27-3, p. 81.

Then,

> Q:    Do you know if there were any calls made on Anthony Mann's inmate number before June?  Was he in Lieber before June?
>
> A:    He was.  I believe he was incarcerated April 17th.

DE No. 27-3, p. 84.

And then again:

> Q:     And did you, in listening to these calls and in your experience with calls in the Department of Corrections, did you hear any three-way calls made?
>
> A:     Frequently.

DE No. 27-3, p. 86.

The Solicitor then elicited additional testimony that petitioner was housed at Lieber, through witness, Paula Stone.

> Q:     Where did you see him?
>
> A:     I saw him in two different institutions.   I saw him in Lieber and the one most recent.

DE No. 27-3, p. 93.

Solicitor Wilson then had witness, Mervin Menier, without objection, testify that he met petitioner at the Charleston County Detention Center. DE No. 27-3, No. 99.

The state court decision is contrary to, or involved an unreasonable application of clearly established federal law, as determined by the Supreme Court of the United States and was based on an unreasonable determination of the facts in light of evidence presented in the state court proceeding.  The opinion simply fails to take into account that it is well-established that the badges of incarceration may undermine the

44

presumption of innocence. *Estelle v. Williams*, 425 U.S. 501 (1976). And see

*United States v. Washington*, 462 F.3d 1124, 1136-37 (9th Cir. 2006) ("As with

prison garb, when a jury is informed that the defendant remained

incarcerated while waiting for trial, this can undermine the presumption of

innocence."). Reasonable counsel would have known to object to the

repeated references by state witnesses that petitioner was housed in a

maximum security prison prior to trial, and indeed, trial counsel did not

provide any reason for why she did not object. The PCR judge's order

completely mischaracterizes the testimony from the hearing, and

substitutes its own "strategic" reason when trial counsel did not, herself,

offer one. Additionally, petitioner's jury was substantially and injurious

effected by counsel's performance because they would have speculated

that since petitioner was already incarcerated in a maximum security

facility, that he must be a dangerous person and therefore more likely to

have committed the crimes here.

**V.    Petitioner was denied the effective assistance of counsel in violation of the Sixth Amendment as a result of the overwhelming cumulative prejudicial effect of each of the enumerated errors committed by trial counsel that also effectively denied Petitioner his fundamental rights of due process and a fair and public trial.**

Petitioner argues that the preceding errors individually provide bases upon which to grant habeas relief but, alternatively, he is entitled to relief based on the cumulative effect of these failures. There is a circuit split on this issue and, to date, the Fourth Circuit has insisted that ineffective assistance of counsel claims must be viewed individually rather than collectively. See *Fisher v. Angelone*, 163 F.3d 835, 852 (4th Cir. 1998) (announcing ineffective assistance of counsel claims "must be reviewed individually, rather than collectively).[7] This Court, however, should follow the reasoning of the Second, Seventh, and Ninth Circuits that allow an inmate like petitioner to prove he suffered ineffective assistance of counsel based on the cumulative effect of trial counsel errors. See *Ewing v. Williams*, 596 F.2d 391, 396 (9th Cir. 1997) (finding that "multiple deficiencies have the cumulative effect of denying a fair trial to the [habeas corpus] petitioner"); A "claim of ineffective assistance of counsel can turn on the cumulative effect of all of counsel's actions." *Rodriguez v. Hoke*, 928 F.2d 534, 538 (2nd Cir. 1991). See also *Williams v. Washington*, 59 F.3d 673,

---

[7] The Eighth, Tenth, and Sixth Circuits follow the Fourth Circuit approach. See *Wainwright v. Lockhart*, 80 F.3d 1226 (8th Cir. 1996); *United States v. Rivera*, 900 F.2d 1462 (10th Cir. 1990); *Sutton v. Bell*, 645 F.3d 752 (6th Cir. 2011).

682 (7th Cir. 1995) (defendant may demonstrate that the cumulative effect of counsel's individual acts or omissions was prejudicial); *Harris ex rel. Ramseyer*, 64 F.3d at 1438 (recognizing that "prejudice may result from the cumulative impact of multiple deficiencies") (internal quotation marks omitted). Even before *Strickland v. Washington*, the Ninth Circuit recognized the cumulative error doctrine. See *Ewing, supra*, 596 F.2d at 396 ("Where no single error or omission of counsel, standing alone, significantly impairs the defense, the district court may nonetheless find unfairness and thus, prejudice emanating from the totality of counsel's errors and omissions.").

If the Constitutional guarantee is the right to a fair trial, it does not make sense that a court is simply not allowed to consider the cumulative effect of multiple errors that occurred in the trial. As the Seventh Circuit noted in *Williams, supra* at 684, "Assessments of prejudice are necessarily fact-intensive determinations peculiar to the circumstances of each case." Any reviewing court should have the ability to assess, collectively, the impact of attorney errors on the outcome of the case. The Fourth Circuit's approach, to date, unnecessarily cabins the judicial role by insisting that it is not allowed to take a larger view of the case in light of multiple errors.

But additionally, the language of *Strickland* itself militates in favor of acknowledging a cumulative effect doctrine in that it "requires showing that counsel's *errors* were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. *Id*. at 687 (emphasis added). The language of *Strickland* appears to invite an assessment of whatever errors may be present to assess their outcome on the reliability of the trial.

The Fourth Circuit's current refusal to acknowledge the viability of the cumulative affect doctrine means that defendants in this Circuit are being afforded less protection than those in the Second, Seventh, and Ninth Circuits. This Court should avail itself of the opportunity to urge a new approach.

## CONCLUSION

This Court should grant the writ.

Respectfully submitted,

/s/Elizabeth A. Franklin-Best
Blume Norris & Franklin-Best LLC
900 Elmwood Avenue, Ste. 200
Columbia, SC 29201
FED ID# 9699
(803) 765-1044
betsy@blumelaw.com

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)
## OF THE FEDERAL RULES OF APPELLATE PROCEDURE

This brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) because it is 10,509 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Fed.R. App.P. 32(a)(5) and the type style requirements of Fed.R.App. P. 32(a)(6) because this brief has been prepared in a proportionality spaced typeface using Microsoft Office Word 2013 in 14-point Book Antiqua.